377 U.S. 184 (1964)
PARDEN ET AL.
v.
TERMINAL RAILWAY OF THE ALABAMA STATE DOCKS DEPARTMENT ET AL.
No. 157.
Supreme Court of United States.
Argued February 26-27, 1964.
Decided May 18, 1964.
CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT.
Al G. Rives argued the cause for petitioners. With him on the briefs was Timothy M. Conway, Jr.
Willis C. Darby, Jr. argued the cause for respondents. With him on the brief was Richmond M. Flowers, Attorney General of Alabama.
MR. JUSTICE BRENNAN delivered the opinion of the Court.
The question in this case is whether a State that owns and operates a railroad in interstate commerce may successfully plead sovereign immunity in a federal-court suit brought against the railroad by its employee under the Federal Employers' Liability Act.
Petitioners, citizens of the State of Alabama, brought suit in the Federal District Court for the Southern District of Alabama against respondent Terminal Railway of the Alabama State Docks Department. They alleged that the Railway was a "common carrier by railroad . . . engaging in commerce between any of the several States" within the terms of the Federal Employers' Liability Act, 45 U. S. C. §§ 51-60, and sought damages under that Act for personal injuries sustained while employed by the *185 Railway. Respondent State of Alabama, appearing specially, moved to dismiss the action on the ground that the Railway was an agency of the State and the State had not waived its sovereign immunity from suit. The District Court granted the motion, and the Court of Appeals for the Fifth Circuit affirmed, 311 F. 2d 727. We granted certiorari, 375 U. S. 810. We reverse.
The Terminal Railway is wholly owned and operated by the State of Alabama through its State Docks Department, and has been since 1927. Consisting of about 50 miles of railroad tracks in the area adjacent to the State Docks at Mobile, it serves those docks and several industries situated in the vicinity, and also operates an interchange railroad with several privately owned railroad companies. It performs services for profit under statutory authority authorizing it to operate "as though it were an ordinary common carrier." 1940 Code of Alabama (recompiled 1958), Tit. 38, § 17.[1] It conducts substantial operations in interstate commerce. It has contracts and working agreements with the various railroad brotherhoods in accordance with the Railway Labor Act, 45 U. S. C. § 151 et seq.; maintains its equipment in conformity with the Federal Safety Appliance Act, 45 U. S. C. § 1 et seq.; and complies with the reporting and bookkeeping requirements of the Interstate Commerce Commission. It is thus indisputably a common carrier by railroad engaging in interstate commerce.
Petitioners contend that it is consequently subject to this suit under the Federal Employers' Liability Act. That statute provides that "every common carrier by railroad while engaging in commerce between any of the several States . . . shall be liable in damages to any person suffering injury while he is employed by such carrier *186 in such commerce," and that "under this chapter an action may be brought in a district court of the United States . . . ." 45 U. S. C. §§ 51, 56. Respondents rely, as did the lower courts in dismissing the action, on sovereign immunitythe principle that a State may not be sued by an individual without its consent. Although the Eleventh Amendment is not in terms applicable here, since petitioners are citizens of Alabama,[2] this Court has recognized that an unconsenting State is immune from federal-court suits brought by its own citizens as well as by citizens of another State. Hans v. Louisiana, 134 U. S. 1; Duhne v. New Jersey, 251 U. S. 311; Great Northern Life Ins. Co. v. Read, 322 U. S. 47, 51; Fitts v. McGhee, 172 U. S. 516, 524. See also Monaco v. Mississippi, 292 U. S. 313. Nor is the State divested of its immunity "on the mere ground that the case is one arising under the Constitution or laws of the United States." Hans v. Louisiana, supra, 134 U. S., at 10; see Duhne v. New Jersey, supra, 251 U. S. 311; Smith v. Reeves, 178 U. S. 436, 447-449; Ex parte New York, 256 U. S. 490, 497-498. But the immunity may of course be waived; the State's freedom from suit without its consent does not protect it from a suit to which it has consented. Clark v. Barnard, 108 U. S. 436, 447; Gunter v. Atlantic Coast Line R. Co., 200 U. S. 273, 284; Petty v. Tennessee-Missouri Bridge Comm'n, 359 U. S. 275. We think Alabama has consented to the present suit.
This case is distinctly unlike Hans v. Louisiana, supra, where the action was a contractual one based on state bond coupons, and the plaintiff sought to invoke the *187 federal-question jurisdiction by alleging an impairment of the obligation of contract.[3] Such a suit on state debt obligations without the State's consent was precisely the "evil" against which both the Eleventh Amendment and the expanded immunity doctrine of the Hans case were directed.[4] Here, for the first time in this Court, a State's claim of immunity against suit by an individual meets a suit brought upon a cause of action expressly created by Congress. Two questions are thus presented: (1) Did Congress in enacting the FELA intend to subject a State to suit in these circumstances? (2) Did it have the power to do so, as against the State's claim of immunity?
We think that Congress, in making the FELA applicable to "every" common carrier by railroad in interstate commerce, meant what it said.[5] That congressional *188 statutes regulating railroads in interstate commerce apply to such railroads whether they are state owned or privately owned is hardly a novel proposition; it has twice been clearly affirmed by this Court. In United States v. California, 297 U. S. 175, the question was whether the federal Safety Appliance Act, 45 U. S. C. §§ 2, 6, applicable by its terms to "any common carrier engaged in interstate commerce by railroad," applied to California's state-owned railroad. The Court unanimously held that it did.[6] In rejecting the argument that "the statute is to be deemed inapplicable to state-owned railroads because it does not specifically mention them," the Court said, in terms equally pertinent here:
"No convincing reason is advanced why interstate commerce and persons and property concerned in it should not receive the protection of the act whenever a state, as well as a privately-owned carrier, brings itself within the sweep of the statute, or why its all-embracing language should not be deemed to afford that protection." 297 U. S., at 185.
In California v. Taylor, 353 U. S. 553, the question was whether the Railway Labor Act, 45 U. S. C. § 151 et seq., applicable by its terms to "any . . . carrier by railroad, subject to the Interstate Commerce Act," applied to the same California state railroad. The Court, again unanimous, held that it did.[7] After noting that "federal *189 statutes regulating interstate railroads, or their employees, have consistently been held to apply to publicly owned or operated railroads," although "none of these statutes referred specifically to public railroads as being within their coverage," 353 U. S., at 562, the Court stated:
"The fact that Congress chose to phrase the coverage of the Act in all-embracing terms indicates that state railroads were included within it. In fact, the consistent congressional pattern in railway legislation which preceded the Railway Labor Act was to employ all-inclusive language of coverage with no suggestion that state-owned railroads were not included." 353 U. S., at 564.
As support for this proposition, the Court relied on three decisions involving the precise question presented by the instant case, in all of which it had been held that the FELA did authorize suit against a publicly owned railroad despite a claim of sovereign immunity. Mathewes v. Port Utilities Comm'n, 32 F. 2d 913 (D. C. E. D. S. C. 1929); Higginbotham v. Public Belt R. Comm'n, 192 La. 525, 188 So. 395 (1938); Maurice v. State, 43 Cal. App. 2d 270, 110 P. 2d 706 (Cal. Dist. C. A. 1941). Thus we could not read the FELA differently here without undermining the basis of our decision in Taylor.
Nor do we perceive any reason for reading it differently. The language of the FELA is at least as broad and all-embracing as that of the Safety Appliance Act or the Railway Labor Act, and its purpose is no less applicable to state railroads and their employees. If Congress made the judgment that, in view of the dangers of railroad work and the difficulty of recovering for personal *190 injuries under existing rules, railroad workers in interstate commerce should be provided with the right of action created by the FELA, we should not presume to say, in the absence of express provision to the contrary, that it intended to exclude a particular group of such workers from the benefits conferred by the Act. To read a "sovereign immunity exception" into the Act would result, moreover, in a right without a remedy; it would mean that Congress made "every" interstate railroad liable in damages to injured employees but left one class of such employeesthose whose employers happen to be state ownedwithout any effective means of enforcing that liability. We are unwilling to conclude that Congress intended so pointless and frustrating a result. We therefore read the FELA as authorizing suit in a Federal District Court against state-owned as well as privately owned common carriers by railroad in interstate commerce.[8]
Respondents contend that Congress is without power, in view of the immunity doctrine, thus to subject a State to suit. We disagree. Congress enacted the FELA in the exercise of its constitutional power to regulate *191 interstate commerce. Second Employers' Liability Cases, 223 U. S. 1. While a State's immunity from suit by a citizen without its consent has been said to be rooted in "the inherent nature of sovereignty," Great Northern Life Ins. Co. v. Read, supra, 322 U. S. 47, 51,[9] the States surrendered a portion of their sovereignty when they granted Congress the power to regulate commerce.
"This power, like all others vested in congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the constitution. . . . If, as has always been understood, the sovereignty of congress, though limited to specified objects is plenary as to those objects, the power over commerce with foreign nations, and among the several States, is vested in congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the constitution of the United States." Gibbons v. Ogden, 9 Wheat. 1, 196-197.
Thus, as the Court said in United States v. California, supra, 297 U. S., at 184-185, a State's operation of a railroad in interstate commerce
"must be in subordination to the power to regulate interstate commerce, which has been granted specifically to the national government. The sovereign power of the states is necessarily diminished to the extent of the grants of power to the federal government in the Constitution. . . . [T]here is no such limitation upon the plenary power to regulate commerce [as there is upon the federal power to tax *192 state instrumentalities]. The state can no more deny the power if its exercise has been authorized by Congress than can an individual."
By empowering Congress to regulate commerce, then, the States necessarily surrendered any portion of their sovereignty that would stand in the way of such regulation. Since imposition of the FELA right of action upon interstate railroads is within the congressional regulatory power, it must follow that application of the Act to such a railroad cannot be precluded by sovereign immunity.[10]
Recognition of the congressional power to render a State suable under the FELA does not mean that the immunity doctrine, as embodied in the Eleventh Amendment with respect to citizens of other States and as extended to the State's own citizens by the Hans case, is here being overridden. It remains the law that a State may not be sued by an individual without its consent. Our conclusion is simply that Alabama, when it began operation of an interstate railroad approximately 20 years after enactment of the FELA, necessarily consented to such suit as was authorized by that Act. By adopting and ratifying the Commerce Clause, the States empowered Congress to create such a right of action against interstate railroads; by enacting the FELA in the exercise of this power, Congress conditioned the right to operate a railroad in interstate commerce upon amenability to suit in federal court as provided by the Act; by thereafter operating a railroad in interstate commerce, Alabama must be taken to have accepted that condition and thus to have consented to suit. "[B]y engaging in interstate commerce by rail, [the State] has subjected itself to the commerce power, and is liable for a violation of the . . . Act, as are other *193 carriers . . . ." United States v. California, supra, 297 U. S., at 185; California v. Taylor, supra, 353 U. S., at 568. We thus agree that
"[T]he state is liable, upon the theory that, by engaging in interstate commerce by rail, it has subjected itself to the commerce power of the federal government.
.....
"It would be a strange situation, indeed, if the state could be held subject to the [Federal Safety Appliance Act] and liable for a violation thereof, and yet could not be sued without its express consent. The state, by engaging in interstate commerce, and thereby subjecting itself to the act, must be held to have waived any right it may have had arising out of the general rule that a sovereign state may not be sued without its consent." Maurice v. State, supra, 43 Cal. App. 2d, at 275, 277, 110 P. 2d, at 710-711.
Accord, Higginbotham v. Public Belt R. Comm'n, supra, 192 La. 525, 550-551, 188 So. 395, 403; Mathewes v. Port Utilities Comm'n, supra.[11]
*194 Respondent deny that Alabama's operation of the railroad constituted consent to suit. They argue that it had no such effect under state law, and that the State did not intend to waive its immunity or know that such a waiver would result. Reliance is placed on the Alabama Constitution of 1901, Art. I, Section 14 of which provides that "the State of Alabama shall never be made a defendant in any court of law or equity"; on state cases holding that neither the legislature nor a state officer has the power to waive the State's immunity;[12] and on cases in this Court to the effect that whether a State has waived its immunity depends upon its intention and is a question of state law *195 only. Chandler v. Dix, 194 U. S. 590; Palmer v. Ohio, 248 U. S. 32; Ford Motor Co. v. Department of Treasury, 323 U. S. 459, 466-470. We think those cases are inapposite to the present situation, where the waiver is asserted to arise from the State's commission of an act to which Congress, in the exercise of its constitutional power to regulate commerce, has attached the condition of amenability to suit. More pertinent to such a situation is our decision in Petty v. Tennessee-Missouri Bridge Comm'n, supra. That was a suit against a bi-state authority created with the consent of Congress pursuant to the Compact Clause of the Constitution. We assumed arguendo that the suit must be considered as being against the States themselves, but held nevertheless that by the terms of the compact and of a proviso that Congress had attached in approving it,[13] the States had waived any immunity they might otherwise have had. In reaching this conclusion we rejected arguments, like the one made here, based on the proposition that neither *196 of the States under its own law would have considered the language in the compact to constitute a waiver of its immunity. The question of waiver was, we held, one of federal law. It is true that this holding was based on the inclusion of the language in an interstate compact sanctioned by Congress under the Constitution. But such compacts do not present the only instance in which the question whether a State has waived its immunity is one of federal law. This must be true whenever the waiver is asserted to arise from an act done by the State within the realm of congressional regulation; for the congressional power to condition such an act upon amenability to suit would be meaningless if the State, on the basis of its own law or intention, could conclusively deny the waiver and shake off the condition. The broad principle of the Petty case is thus applicable here: Where a State's consent to suit is alleged to arise from an act not wholly within its own sphere of authority but within a spherewhether it be interstate compacts or interstate commercesubject to the constitutional power of the Federal Government, the question whether the State's act constitutes the alleged consent is one of federal law. Here, as in Petty, the States by venturing into the congressional realm "assume the conditions that Congress under the Constitution attached." 359 U. S., at 281-282.
Our conclusion that this suit may be maintained is in accord with the common sense of this Nation's federalism. A State's immunity from suit by an individual without its consent has been fully recognized by the Eleventh Amendment and by subsequent decisions of this Court. But when a State leaves the sphere that is exclusively its own and enters into activities subject to congressional regulation, it subjects itself to that regulation as fully as if it were a private person or corporation. Cf. South Carolina v. United States, 199 U. S. 437, 463; New York v. *197 United States, 326 U. S. 572. It would surprise our citizens, we think, to learn that petitioners, who in terms of the language and purposes of the FELA are on precisely the same footing as other railroad workers,[14] must be denied the benefit of the Act simply because the railroad for which they work happens to be owned and operated by a State rather than a private corporation. It would be even more surprising to learn that the FELA does make the Terminal Railway "liable" to petitioners, but, unfortunately, provides no means by which that liability may be enforced. Moreover, such a result would bear the seeds of a substantial impediment to the efficient working of our federalism. States have entered and are entering numerous forms of activity which, if carried on by a private person or corporation, would be subject to federal regulation. See South Carolina v. United States, supra, 199 U. S., at 454-455. In a significant and *198 increasing number of instances, such regulation takes the form of authorization of lawsuits by private parties. To preclude this form of regulation in all cases of state activity would remove an important weapon from the congressional arsenal with respect to a substantial volume of regulable conduct. Where, as here, Congress by the terms and purposes of its enactment has given no indication that it desires to be thus hindered in the exercise of its constitutional power, we see nothing in the Constitution to obstruct its will.
Reversed.
MR. JUSTICE WHITE, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE HARLAN, and MR. JUSTICE STEWART join, dissenting.
I agree that it is within the power of Congress to condition a State's permit to engage in the interstate transportation business on a waiver of the State's sovereign immunity from suits arising out of such business. Congress might well determine that allowing regulable conduct such as the operation of a railroad to be undertaken by a body legally immune from liability directly resulting from these operations is so inimical to the purposes of its regulation that the State must be put to the option of either foregoing participation in the conduct or consenting to legal responsibility for injury caused thereby.
However, the decision to impose such conditions is for Congress and not for the courts. The majority today follows the Court's consistent holdings that an unconsenting State is constitutionally immune from federal court suits brought by its own citizens as well as by citizens of other States. It should not be easily inferred that Congress, in legislating pursuant to one article of the Constitution, intended to effect an automatic and compulsory waiver of rights arising under another. Only when Congress has clearly considered the problem and *199 expressly declared that any State which undertakes given regulable conduct will be deemed thereby to have waived its immunity should courts disallow the invocation of this defense. Particular deference should be accorded that "old and well-known rule that statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign without express words to that effect," United States v. Mine Workers, 330 U. S. 258, 272, where the rights and privileges find their origin in the Constitution. Far from manifesting such an unequivocal determination, the legislative history of the Federal Employers' Liability Act indicates that Congress did not even consider the possible impact of its legislation upon state immunity from suits. The expressed purpose of the Act was "to change the common-law liability of employers."[1] Certain specific defenses available to a railroad employer in an employee's personal injury suit were removed, but sovereign immunity was not one of them. To require Alabama's immunity defense to yield because of a claimed inconsistency with language of the Act making its provisions applicable to "every common carrier by railroad while engaging in commerce" relegates the States' constitutional immunity, not even mentioned in the Act, to the level of state statutory or common-law defenses, four of which the statute expressly proscribed. A decent respect for the normally preferred position of constitutional rights dictates that if Congress decides to exercise its power to condition privileges within its control on the forfeiture of constitutional rights its intention to do so should appear with unmistakable clarity.
In previous opinions the Court has indicated that waiver of sovereign immunity will be found only where *200 stated by "the most express language or by such overwhelming implication from the text as would leave no room for any other reasonable construction." Murray v. Wilson Distilling Co., 213 U. S. 151, 171. See Ford Motor Co. v. Department of Treasury, 323 U. S. 459, 468-470. If the automatic consequence of state operation of a railroad in interstate commerce is to be waiver of sovereign immunity, Congress' failure to bring home to the State the precise nature of its option makes impossible the "intentional relinquishment or abandonment of a known right or privilege" which must be shown before constitutional rights may be taken to have been waived. Johnson v. Zerbst, 304 U. S. 458, 464; Fay v. Noia, 372 U. S. 391. The majority in effect holds that with regard to sovereign immunity, waiver of a constitutional privilege need be neither knowing nor intelligent.[2]
Preferring to leave the limiting of constitutional defenses to that body empowered to impose such conditions, I respectfully dissent.
NOTES
[1] See also Ala. Const. of 1901, amendment 116; 1940 Code of Ala. (recompiled 1958), Tit. 38, §§ 45 (14), (16).
[2] The Eleventh Amendment provides:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."
[3] Of the other cases cited in which federal-question jurisdiction was asserted, Smith v. Reeves, 178 U. S. 436, and Ex parte New York, 256 U. S. 490, were also commonplace suits in which the federal question did not itself give rise to the alleged cause of action against the State but merely lurked in the background. The former case was a tax-refund suit brought by receivers of a corporation created by Congress, and the latter was an admiralty suit for property damage due to negligence. Duhne v. New Jersey, 251 U. S. 311, was a suit against the State to restrain it from enforcing the Eighteenth Amendment to the Federal Constitution, on the ground that the Amendment was invalid.
[4] See Cohens v. Virginia, 6 Wheat. 264, 406-407; Hans v. Louisiana, 134 U. S. 1, 12-13, 16; The Federalist, No. 81 (Hamilton) (Cooke ed. 1961), at 548-549; Irish and Prothro, The Politics of American Democracy, at 123 (1959), quoted in Petty v. Tennessee-Missouri Bridge Comm'n, 359 U. S. 275, 276, n. 1; Jaffe, Suits Against Governments and Officers: Sovereign Immunity, 77 Harv. L. Rev. 1, 19 (1963).
[5] Although the language of the Act itself is clear enough, further indication of the congressional desire to cover all rail carriers that constitutionally could be covered is found in the legislative history, where the House Report states that "This bill relates to common carriers by railroad engaged in interstate . . . commerce . . . . It is intended in its scope to cover all commerce to which the regulative power of Congress extends." H. R. Rep. No. 1386, To Accompany H. R. 20310, 60th Cong., 1st Sess. (1908).
[6] The suit had been brought against the State not by an individual but by the United States, to recover the statutory penalty for violation of the Act.
[7] The suit was not against the State, but against members of the National Railroad Adjustment Board to compel them to take jurisdiction over the railroad under the Act. The Court left open, 353 U. S., at 568, n. 16, the question whether the Eleventh Amendment would bar an employee of the railroad from enforcing an award by the Board in a suit against the State in a Federal District Court.
[8] Respondents make an argument based on the provision in 45 U. S. C. § 56 that the jurisdiction of the federal courts under the FELA "shall be concurrent with that of the courts of the several States." The contention is that since Alabama's courts would not have taken jurisdiction over this suit, the "concurrent" jurisdiction of the federal courts must be similarly limited. See Hans v. Louisiana, supra, 134 U. S., at 18-19; but see Chisholm v. Georgia, 2 Dall. 419; South Dakota v. North Carolina, 192 U. S. 286, 318. It is clear, however, that Congress did not intend this language to limit the jurisdiction of the federal courts, but merely to provide an alternative forum in the state courts. See O'Donnell v. Elgin, J. & E. R. Co., 193 F. 2d 348, 352-353 (C. A. 7th Cir. 1951), cert. denied, 343 U. S. 956; Trapp v. Baltimore & O. R. Co., 283 F. 655 (D. C. N. D. Ohio 1922); Waltz v. Chesapeake & O. R. Co., 65 F. Supp. 913 (D. C. N. D. Ill. 1946).
[9] See also The Federalist, No. 81 (Hamilton) (Cooke ed. 1961), at 548, quoted in Hans v. Louisiana, supra, 134 U. S., at 13. Compare Jaffe, note 4, supra, 77 Harv. L. Rev., at 3, 18.
[10] "[B]y engaging in the railroad business a State cannot withdraw the railroad from the power of the federal government to regulate commerce." New York v. United States, 326 U. S. 572, 582 (opinion of Frankfurter, J.).
[11] Respondents argue that Congress could not "directly strip a state of its sovereign immunity from suit by a citizen," and hence cannot constitutionally impose a condition of amenability to suit upon the State's right to operate a railroad in interstate commerce. Reliance is placed on such cases as Howard v. Illinois Central R. Co., 207 U. S. 463, 502-503, and Frost & Frost Trucking Co. v. Railroad Comm'n of California, 271 U. S. 583. In Howard, the Court held the first Federal Employers' Liability Act unconstitutional because it applied to intrastate as well as interstate commerce, rejecting the argument that "the act is constitutional, although it embraces subjects not within the power of Congress to regulate commerce, because one who engages in interstate commerce thereby submits all his business concerns to the regulating power of Congress." 207 U. S., at 502. In Frost & Frost, the Court held that since a private carrier could not constitutionally be converted against its will into a common carrier by mere legislative command, such a condition could not be attached to the carrier's right to use the highways. Both cases are clearly distinguishable because the condition sought to be imposed was deemed by the Court to fall outside the scope of valid regulation. Thus in Howard the statute's application to intrastate commerce was described as an attempt by Congress to exercise "power not delegated to it by the Constitution, in other words, . . . the right to legislate concerning matters of purely state concern," 207 U. S., at 502, and in Frost & Frost the Court stated that "the act, as thus applied, is in no real sense a regulation of the use of the public highways. It is a regulation of the business of those who are engaged in using them." 271 U. S., at 591. Here, in contrast, Congress does have authority, within its power to regulate commerce, to subject interstate railroads to suit under the FELA; by imposing a condition requiring state-owned interstate railroads to submit to such suit, Congress is not attempting to extend its regulatory power to objects that would not otherwise be subject to it, but rather to prevent objects otherwise subject to the power from being unjustifiably excepted. That Congress could not make a State suable upon all causes of action does not mean that it cannot do so with respect to this particular cause of action, where imposition of such liability is within its power to regulate commerce and where the State, by operating a railroad in interstate commerce, has voluntarily submitted itself to that power.
[12] Dunn Construction Co. v. State Board of Adjustment, 234 Ala. 372, 376, 175 So. 383, 386 (1937); State Tax Comm'n v. Commercial Realty Co., 236 Ala. 358, 361, 182 So. 31, 35 (1938).
[13] This proviso was that "nothing herein contained shall be construed to affect, impair, or diminish any right, power, or jurisdiction of . . . any court . . . of the United States over or in regard to any navigable waters or any commerce between the States . . . ." The Court read this as reserving the jurisdiction of the federal courts in suits brought against the bi-state authority under the Jones Act or any other applicable congressional regulation of navigation or commerce. 359 U. S., at 281. The Court's reliance on this congressionally imposed condition in Petty is itself sufficient to refute respondents' argument here that since Congress has no power to "directly strip a State of its sovereign immunity," it could not impose such suability as a condition to the State's operation of a railroad in interstate commerce. See note 11, supra. It was presumably just as true in Petty as it is here that Congress could not directly subject the States to suit in matters falling outside the power granted to Congress by the Constitution. Yet Petty held that Congress could impose such suability as a condition to allowing the States to enter into the compact. Similarly, Congress can do so here as a condition to allowing the State to operate an interstate railroad.
[14] An employee regulation of respondent Terminal Railway explicitly recognizes that its employees may have causes of action under the FELA, providing as follows:

"Employees must not make any statement, either oral or written, concerning any accident, claim or suit in which the company is, or may be involved, to any person other than [an] authorized representative of the railway, without permission, [e]xcept in cases arising under the Federal Employers' Liability Act, otherwise known as `an act relating to the liability of common carriers by railroad to their employees in certain cases.' "
The exception for cases arising under the FELA is required by 45 U. S. C. § 60. Asked about this regulation, respondents' counsel said on oral argument that it did not indicate an intention to be subject to the Act, and could not do so in the face of the Alabama Constitution, see p. 194, supra, but had been included inadvertently when the Railway was adopting a number of regulations based upon those used by a private railroad carrier. Nevertheless, the presence of this regulation on the Terminal Railway's books illustrates, we think, the incongruity of considering this railroad to be immune from a statutory obligation imposed on privately owned railroads that are similar in every material respect.
[1] H. R. Rep. No. 1386, 60th Cong., 1st Sess., 1 (1908). In debate on the House floor Representative Henry also summarized the Act as having "changed four rules of the common law." 42 Cong. Rec. 4427.
[2] Petty v. Tennessee-Missouri Bridge Comm'n, 359 U. S. 275; California v. Taylor, 353 U. S. 553, and United States v. California, 297 U. S. 175, are all inapposite. In Petty there was an express waiver, the compact itself expressly declaring that the bi-state authority could "sue and be sued." Taylor was not a suit against a State but against the members of the National Railroad Adjustment Board requiring them to take action on the plaintiffs' claims under the Railway Labor Act. Though the Court held the Act applicable to the State Belt Railroad it expressly disclaimed deciding any sovereign immunity issue. Footnote 16 of that opinion states: "The contention of the State that the Eleventh Amendment to the Constitution of the United States would bar an employee of the Belt Railroad from enforcing an award by the National Railroad Adjustment Board in a suit against the State in a United States District Court under § 3, First (p), of the Act is not before us under the facts of this case." 353 U. S., at 568. And the suit to recover the statutory penalty for violation of the federal Safety Appliance Act in United States v. California was brought by the United States, against whom it has long been recognized there is no state sovereign immunity. United States v. Texas, 143 U. S. 621.